**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MEGAN SHIPLEY and KIMBERLY AIGNER, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COTY INC.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Megan Shipley and Kimberly Aigner ("Plaintiffs"), individually and on behalf of all others similarly situated, by their attorneys, hereby file this Class Action Complaint against Coty Inc. ("Defendant") and allege the following upon information and belief, except for those assertions pertaining to Plaintiffs, which are based on personal knowledge:

## NATURE OF THE ACTION

1. Defendant manufactures, markets, labels, distributes, and sells COVERGIRL CLEAN makeup powders, including COVERGIRL CLEAN INVISIBLE PRESSED POWDER in numerous shades and configurations and COVERGIRL CLEAN INVISIBLE LOOSE POWDER in numerous shades and configurations (collectively, the "Products").

2. Defendant uniformly represents on the front labels of the Products that the Products are "CLEAN".

3. Defendant reinforces this CLEAN representation with numerous other statements on the front-label of the packaging enclosing the Products, including that the Products are "TALC

& FRAGRANCE FREE" and "Vegan" and, on the back-label, that the Products are "TALC FREE", "FRAGRANCE FREE", "PARABEN FREE", "SULFATE FREE", "PHTHALATE FREE", "OIL-FREE", contain "NO MINERAL OIL" and are "DERMATOLOGICALLY-TESTED" (collectively, the "Representations").

4. These Representations reasonably lead consumers to believe that the Products are clean and free from unnecessary and potentially harmful ingredients and contaminants such as lead and/or arsenic.

5. Defendant's Representations are false and misleading based on Defendant's failure to disclose that the Products contain a substantial amount of lead and arsenic—known heavy metal toxins that are strongly linked to detrimental health effects.

6. The undisclosed lead and arsenic in the Products are material to purchasers of the COVERGIRL CLEAN brand, who seek to purchase clean beauty products.

7. Defendant knew or should have known that the Products contain lead and arsenic.

8. Defendant intentionally made the Representations but failed to disclose the lead and arsenic in the Products to increase its profits, to the detriment of consumers who spent money that they would not have spent if they knew the truth.

9. There are other similar products available for purchase that do not contain lead or arsenic, or do not contain lead and arsenic in the substantial quantities present in the Products.

10. Consumers have been and continue to be deprived of making an informed choice between purchasing Defendant's Products, which contain a substantial amount of lead and arsenic, and other, similar products, that do not contain lead and arsenic.

11. Plaintiffs and Class members have suffered injury by purchasing the Products that they would not have purchased, or would not have purchased at a premium, if they knew that the

Representations were false and misleading and that the Products contained arsenic and lead or were at risk of containing arsenic and lead.

12. Plaintiffs bring this action against Defendant on behalf of themselves and Class members who purchased the Products during the applicable statute of limitations period ("Class Period"), as defined herein.

**JURISDICTION AND VENUE**

13. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which: (1) there are over 100 members in the proposed Class; (2) members of the proposed Class have a different citizenship than Defendant; and (3) the claims of the proposed Class members exceed $5,000,000 in the aggregate.

14. The Court has personal jurisdiction over Defendant because Defendant's contacts with this forum are continuous and substantial. Defendant intentionally availed itself of the markets within Illinois through the sale and distribution of the Products in Illinois and through the privilege of conducting business in Illinois.

15. Defendant has engaged in conduct in this District that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, including because Defendant placed the Products into the stream of commerce directed at this District, and because Defendant purposely availed itself of the laws of the United States and the State of Illinois.

16. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Defendant engages in continuous and systematic business activities within the State of Illinois. Moreover, a substantial part of the events and conduct giving rise to the claims alleged herein occurred in this district.

## PARTIES

**I. Plaintiffs**

17. Plaintiff Megan Shipley is, and at all relevant times was, a citizen of Illinois and a resident of Chicago, Illinois. In 2026, Plaintiff Shipley purchased (a) Covergirl Clean Invisible Pressed Powder, Tawny 165; and (b) Covergirl Clean Invisible Pressed Powder, Golden Caramel 180.

18. Plaintiff Kimberly Aigner is, and at all relevant times was, a citizen of Illinois and a resident of Montgomery, Illinois. In 2026, Plaintiff Aigner purchased (a) Covergirl Clean Invisible Pressed Powder, Tawny 165; (b) Covergirl Clean Invisible Pressed Powder, Golden Caramel 180; (c) Clean Invisible Loose Powder, Translucent Light 110; and (d) Clean Invisible Loose Powder, Translucent Dark 140.

**II. Defendant**

19. Defendant Coty Inc. is a Delaware corporation with its principal place of business in New York, NY.

## COMMON FACTUAL ASSERTIONS

### Defendant's Misrepresentations

20. Defendant's COVERGIRL CLEAN Products rest on the promise the powders are "CLEAN" and free from potentially undesirable ingredients and elements.

21. The following are images of the packaging enclosing the CLEAN INVISIBLE PRESSED POWDER and CLEAN INVISIBLE LOOSE POWDER Products:


TALC &
FRAGRANCE FREE
SANS
TALC NI PARFUM
CLEAN INVISIBLE
LOOSE POWDER
135
TRANSLUCENT DEEP
PROFOND DIAPHANE
TRASLÚCIDO INTENSO
CLEAN
INVISIBLE
COVERGIRL


COVERGIRL®
CLEAN INVISIBLE
LOOSE POWDER
POUDRE LIBRE
POLVO SUELTO
135
TRANSLUCENT DEEP
PROFOND DIAPHANE
TRASLÚCIDO INTENSO
COVERGIRL.COM
1-800-4COVER4


TALC &
FRAGRANCE FREE
SANS TALC
NI PARFUM
SIN TALCO NI FRAGANCIA
158
WARM NUDE
CHAIR ARDENTE
PIEL CÁLIDO
CLEAN INVISIBLE
PRESSED POWDER
COVERGIRL
CLEAN
INVISIBLE
NET WT. / POIDS NET / PESO NETO
11 g (0.38 OZ.)


COVERGIRL®
CLEAN INVISIBLE
PRESSED POWDER
POUDRE PRESSÉE
POLVO COMPACTO
158
WARM NUDE
CHAIR ARDENTE
PIEL CÁLIDO
COVERGIRL.COM
1-800-4COVER4
614800

22. Defendant prominently and uniformly represents on the front label of the Products that they are "CLEAN".

23. This CLEAN representation is reinforced by numerous other statements on the labels of the Products, including that the Products are "Vegan", "TALC FREE", "FRAGRANCE FREE", "PARABEN FREE", "SULFATE FREE", "PHTHALATE FREE", "OIL-FREE", contain "NO MINERAL OIL" and are "DERMATOLOGICALLY-TESTED".

24. These label Representations are intentionally designed and used by Defendant to convey to consumers of the Products that the Products are free from potentially harmful ingredients and elements.

25. The Representations are reinforced by Defendant's statements on its covergirl.com website that the Products are: "Talc & Fragrance free"; "Vegan & formulated without Parabens, Sulfates, Phthalates & Mineral Oil" made "With 100% natural-origin pigments & only 14 essential ingredients"; "Suitable for all skin types, even dry & sensitive"; "Non-Comedogenic / Does not clog pores"; "Dermatologically Tested" and "Approved by Cruelty-Free International".[1]

26. These label and website statements are demonstrative of the Representations made by Defendant, which reinforce the notion that the Products are clean and free from unnecessary and potentially harmful ingredients and contaminants.

27. Defendant intentionally makes these Representations to foster consumer trust in the Products.

28. The Representations are optional advertising statements.

29. The Representations are not required or governed by any federal or FDA guidance or regulation.

---

[1] https://www.covergirl.com/face-makeup/powder/clean-invisible-pressed-powder (last accessed on November 16, 2026).

30. Defendant voluntarily makes the Representations on the labels of the Products to appeal to consumers and increase sales of the Products, including by capitalizing on consumer desire to purchase clean beauty products.

31. Defendant intentionally makes the label Representations but fails to disclose the lead and arsenic in the Products.

32. The disclosure of lead and arsenic in the Products would negatively impact Defendant's sales of the Products and its bottom line.

**Defendant's Products Contain Undisclosed Lead and Arsenic**

33. Plaintiffs' counsel commissioned scientific testing of Defendant's Products by an independent laboratory, which holds numerous accreditations, including ISO/IEC 17025:2017 and the FDA Laboratory Accreditation for Analysis of Foods (LAAF).

34. Testing was conducted using a specialized version of the EPA 200.8 method with a technique called Inductively Coupled Plasma Mass Spectrometry ("ICP-MS").

35. ICP-MS is the industry standard to test for heavy metals, and accepted within the scientific community due to its high precision and sensitivity in measuring heavy metals, including lead and arsenic.

36. The FDA has validated ICP-MS and it is the approved methodology used by the FDA to test for the presence of heavy metals in food.[2]

37. According to the independent, scientific testing commissioned by Plaintiffs' counsel between May 2026 and November 2026, each of the Products contains lead and arsenic, as follows:

---

[2] *See* https://www.fda.gov/food/environmental-contaminants-food/lead-food-and-foodwares (linking to an Elemental Analysis Manual for Inductively Coupled Plasma-Mass Spectrometric Determination).

| PRODUCT TESTED | LEAD IN PRODUCT IN PPM | Lead in the Product versus Prop 65 daily limit of **0.5 µg per day** of lead (1 ppm = 1 µg/g)[3] | ARSENIC IN PRODUCT IN PPM | Arsenic in Product versus Prop 65 daily limit of **0.06 µg per day** of inhaled arsenic (1 ppm = 1 µg/g)[4] |
|---|---|---|---|---|
| COVERGIRL CLEAN INVISIBLE PRESSED POWDER Creamy Natural 120 | 4.895 | 9.8x | 1.045 | 17.4x |
| COVERGIRL CLEAN INVISIBLE PRESSED POWDER Tawny 165 | 4.045 | 8.1x | 1.442 | 24.0x |
| COVERGIRL CLEAN INVISIBLE PRESSED POWDER Golden Caramel 180 | 3.793 | 7.6x | 1.050 | 17.5x |
| COVERGIRL CLEAN INVISIBLE PRESSED POWDER Buff Beige 125 | 3.782 | 7.6x | 1.148 | 19.1x |

[3] While Plaintiffs do not bring claims pursuant to Proposition 65 or for violation of any state or federal regulation related to heavy metals, the Proposition 65 Maximum Allowable Dose Level ("MADL") provides an objective metric against which Plaintiffs' claims that the lead and arsenic contained in the Products are substantial and material can be measured. See Office of Environmental Health Hazard Assessment ("OEHHA"), Proposition 65 No Significant Risk Levels (NSRLs) and Maximum Allowable Dose Levels (MADLs), https://oehha.ca.gov/proposition-65/general-info/proposition-65-no-significant-risk-levels-nsrls-and-maximum-allowable-dose-levels-madls; Cal. Code Regs. tit. 27, §§ 25705(b), 25805(b).

[4] *Id.*

| | | | | |
|---|---|---|---|---|
| COVERGIRL CLEAN INVISIBLE PRESSED POWDER Warm Nude 158 | 2.735 | 5.5x | 1.009 | 16.8x |
| COVERGIRL CLEAN INVISIBLE LOOSE POWDER Translucent Light 110 | 2.744 | 5.5x | 1.215 | 20.3x |
| COVERGIRL CLEAN INVISIBLE LOOSE POWDER Translucent Dark 140 | 2.727 | 5.5x | 1.063 | 17.7x |
| COVERGIRL CLEAN INVISIBLE LOOSE POWDER Translucent Deep 135 | 2.402 | 4.8x | .990 | 16.5x |

38. All of the tested products contain a substantial amount of lead and arsenic.

39. The Products are uniformly composed and formulated, including based on the mixed mineral ingredients.

40. The uniformity of the Product ingredients means that every shade and type of the Products contains a substantial amount of lead and arsenic.

41. The amount of lead and arsenic contained in the Products is uniformly more than the amount of lead and arsenic consumers reasonably expect to find in the Products based on the Representations.

42. According to independent scientific testing commissioned by Plaintiffs' counsel, other, similar makeup products that are not manufactured by Defendant contain far less lead and arsenic, or undetectable levels of lead and arsenic. For example, scientific testing of Neutrogena

Sensitive Skin Foundation found that lead or arsenic was not present in the product or was non-detectable. Similarly, testing of Maybelline Super Stay 24H Hybrid Powder found that there was a non-detectable amount of arsenic in the product and the amount of lead present was 0.045 ppm—an amount that is 45 times lower than the lowest amount of lead detected in the Products.

**<u>Lead is Harmful to Human Health</u>**

43. Lead is a toxic heavy metal. The scientific consensus is that there is no level of lead that is safe for human exposure or consumption.

44. According to the Mayo Clinic, "[l]ead poisoning occurs when lead builds up in the body, often over months or years. Even small amounts of lead can cause serious health problems."[5]

45. According to The World Health Organization, "there is no level of exposure to lead that is known to be without harmful effects" and that "[e]xposure to lead can affect multiple body systems and is particularly harmful to young children and women of child-bearing age."[6]

46. The U.S. Centers for Disease Control and Prevention cautions that "[e]ven low levels of lead in blood have been shown to have an effect."[7]

47. At very high levels, lead poisoning can be fatal.[8]

48. Lead affects nearly every organ and system in the body and accumulates in the body over time, causing severe toxicity, including by inhibiting neurological function and causing anemia, kidney damage, seizures, and even death.[9]

---

[5] https://www.mayoclinic.org/diseases-conditions/lead-poisoning/symptoms-causes/syc-20354717.

[6] https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health.

[7] U.S. Centers for Disease Control, CDC Updates Blood Lead Reference Value (Apr. 2, 2024), https://www.cdc.gov/lead-prevention/php/news-features/updates-blood-lead-reference-value.html#cdc_generic_section_3-effects-on-lead-in-the-blood.

[8] https://www.mayoclinic.org/diseases-conditions/lead-poisoning/symptoms-causes/syc-20354717.

[9] Wani AL, et al., Lead toxicity: a review, INTERDISCIP TOXICOL. (June 2015), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4961898.

49. Lead exposure has been shown to reduce intelligence, and to increase the risk of mental illness, dementia, hypertension, arrhythmia, and breast cancer.[10]

50. Lead can enter the body through inhalation, absorption and ingestion.

51. "The effects of lead are the same whether it enters the body by breathing it in or eating it."[11]

52. Lead-containing dust can get "on your hands, or into your mouth and nose and be swallowed."[12]

53. Peer-reviewed research has further reported that inorganic lead compounds applied to the skin, can be absorbed percutaneously.[13]

54. Lead is especially harmful to reproductive health. ATSDR warns that "[i]n pregnant women, exposure to high levels of lead may cause a miscarriage," that "[e]xposure to lead during pregnancy can also result in premature births," and that "[i]n men, it can cause damage to reproductive organs."[14]

55. Children may be exposed to lead "before birth from lead in their mother's body."[15]

---

[10] Maryse F. Bouchard, PhD et al., *Blood Lead Levels and Major Depressive Disorder, Panic Disorder, and Generalized Anxiety Disorder in US Young Adults*, 66 ARCHIVES OF GENERAL PSYCHIATRY 1313, 1317 (Dec 2009); Marc G. Weisskopf et al., *Cumulative Lead Exposure and Prospective Change in Cognition Among Elderly Men*, 160 AMERICAN JOURNAL OF EPIDEMIOLOGY 1184, 1185, 1188, 1190-91 (2004); Olusegun I. Alatise, Gerhard N. Schrauzer, *Lead Exposure: A Contributing Cause of the Current Breast Cancer Epidemic in Nigerian Women*, 136 BIOLOGICAL TRACE ELEMENT RESEARCH 127, 138 (Mar. 3, 2010).

[11] Agency for Toxic Substances & Disease Registry ("ATSDR"), Ctrs. for Disease Control & Prevention, *ToxFAQs: Lead* (Aug. 2020), https://www.atsdr.cdc.gov/toxfaqs/tfacts13.pdf.

[12] *Id.*

[13] J.L. Stauber et al., *Percutaneous Absorption of Inorganic Lead Compounds*, 145 Sci. Total Env't 55 (1994), PMID 8016629, https://pubmed.ncbi.nlm.nih.gov/8016629/.

[14] ATSDR, *ToxFAQs: Lead*, *supra* note 11.

[15] *Id.*

56. Lead is also a suspected carcinogen. The U.S. Department of Health and Human Services has determined that "lead and lead compounds are reasonably anticipated to be human carcinogens," the EPA "has classified lead as a probable human carcinogen," and the International Agency for Research on Cancer has determined that "inorganic lead is probably carcinogenic to humans."[16]

**<u>Inhaled Arsenic is Dangerous and Carcinogenic</u>**

57. Arsenic is a known human carcinogen.

58. The U.S. Department of Health and Human Services, the EPA, and the International Agency for Research on Cancer have each determined that inorganic arsenic causes cancer in humans.[17]

59. The National Toxicology Program lists arsenic and inorganic arsenic compounds as "known to be human carcinogens," and associates them with cancers of the lung, skin, digestive tract, liver, urinary bladder, kidney, and lymphatic and hematopoietic systems.[18]

60. ATSDR warns that "[i]nhalation of inorganic arsenic can cause increased risk of lung cancer," that "[a]rsenic can cross the placenta and has been found in fetal tissues," and that "inhaled or ingested arsenic can injure pregnant women or their unborn babies."[19]

61. Regulators recognize that inhaled arsenic is especially dangerous. California's Proposition 65 "No Significant Risk Level" for inorganic arsenic is 10 micrograms per day for

---

[16] ATSDR, *ToxFAQs: Lead*, *supra* note 11.

[17] ATSDR, Ctrs. for Disease Control & Prevention, *ToxFAQs: Arsenic* (Aug. 2007), https://www.atsdr.cdc.gov/toxfaqs/tfacts2.pdf.

[18] Nat'l Toxicology Program, U.S. Dep't of Health & Human Servs., *Report on Carcinogens* (15th ed.), *Arsenic and Inorganic Arsenic Compounds*, https://ntp.niehs.nih.gov/sites/default/files/ntp/roc/content/profiles/arsenic.pdf.

[19] ATSDR, *ToxFAQs: Arsenic*, *supra* note 11.

routes other than inhalation, but only 0.06 micrograms per day by inhalation, a threshold more than 160 times lower.[20]

62. Defendant's Products contain inorganic arsenic. See above Table.[21]

63. Defendant's Products are applied to the face, including immediately around the nose and mouth, typically with a brush, sponge, or puff that distributes the powder.

64. Peer-reviewed research confirms that applying cosmetic powders "result[s] in the release and inhalation of airborne particles,"[22] and that inhaled cosmetic powder particles deposit throughout the respiratory tract, including the alveolar region of the lungs.[23]

**Consumers Are Misled and Deceived**

65. Reasonable consumers of Defendant's Products, including Plaintiffs, are misled and deceived by Defendant's Representations and failure to disclose that the Products contain lead and arsenic.

66. Based on the Representations, consumers reasonably believe that the Products are clean and free from potentially harmful ingredients or contaminants, such as lead and arsenic.

67. This belief is reinforced by Defendant's "free of" Representations.

68. Consumers reasonably believe that the Products do not contain or risk containing potentially harmful ingredients and contaminants such as lead and arsenic, and that Defendant would disclose that the Products contain or risk containing lead and arsenic.

---

[20] OEHHA, *NSRLs and MADLs*, *supra* note 3

[21] *See also* https://pmc.ncbi.nlm.nih.gov/articles/PMC4186553/ (explaining the environmental source of arsenic exposure).

[22] Hyun-Jeong Oh, Taewon T. Han & Gediminas Mainelis, *Potential Consumer Exposure to Respirable Particles and TiO2 due to the Use of Eyebrow Powders*, 31 J. Exposure Sci. & Envtl. Epidemiology 1032 (2021), https://doi.org/10.1038/s41370-020-00278-1.

[23] Yevgen Nazarenko et al., *Nanomaterial Inhalation Exposure from Nanotechnology-Based Cosmetic Powders: A Quantitative Assessment*, 14 J. Nanoparticle Res. 1229 (2012), PMID 23175627, https://pubmed.ncbi.nlm.nih.gov/23175627/.

69. In the face of Defendant's Representations, reasonable consumers understand Defendant's lack of disclosures or statements about the presence of lead and arsenic in the Products to mean that there is no lead or arsenic in the Products.

70. The presence of lead and arsenic in the Products is material.

71. Reasonable consumers, and especially consumers who specifically seek out clean cosmetics, would consider the presence of lead and arsenic important in their purchasing decision.

72. Consumers cannot determine that the Products contain lead and arsenic at the point of sale, which can only be determined based on complex scientific testing.

73. Plaintiffs and Class members would not have purchased the Products, or would have paid less for them, had they known the Products contained lead and arsenic.

74. Consumers have been deprived of making the informed purchase choice between the Products, which contain lead and arsenic, and other powder makeup products, which do not.

***Defendant Profits from its Misconduct***

75. Defendant intentionally misrepresented, concealed, and omitted material information about the presence of lead and arsenic in the Products.

76. The disclosure of lead and arsenic in the Products would negatively impact Defendant's sales of the Products.

77. If consumers knew the truth, Defendant would not be able to charge as much for the Products and/or consumers would not purchase the Products.

78. To avoid this loss of sales, Defendant chose to label the Products with the Representations, but not to disclose the lead and arsenic in the Products.

79. Defendant is in the unique and superior position of knowing the ingredients and raw materials used in the manufacturing of its Products and possesses unique and superior

knowledge regarding the manufacturing of the Products, including the risks associated with those ingredients and manufacture for heavy metal inclusion and contamination.

80. Defendant has the unique ability to test the Products for heavy metals prior to releasing the Products into the stream of commerce.

81. Testing for lead and arsenic requires specialized scientific testing, and reasonable consumers do not engage in such testing before purchasing the Products.

82. As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive Representations and omissions, Defendant injured Plaintiffs and the Class members in that they:

a. Paid a sum of money for Products that were not as Defendant represented;

b. Paid a premium price for Products that were not as Defendant represented;

c. Were deprived of the benefit of the bargain because the Products they purchased were different from what Defendant warranted; and

d. Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented.

83. Plaintiffs would purchase the Products in the future if Defendant accurately represented the Products as clean and free of potentially harmful ingredients and contaminants.

84. Plaintiffs and Class members continue to suffer harm because they cannot rely on the labeling and advertising of the Products for its truth and are therefore unable to determine whether they can purchase the Products in the future.

85. Unless Defendant is enjoined from failing to misrepresent the Products or to disclose the presence of lead and arsenic in the Products in the future, Plaintiffs and consumers

will not be able to reasonably determine whether the lead and arsenic in the Products has been addressed and remedied.

86. Accordingly, Plaintiffs' legal remedies are inadequate to provide complete relief and prevent future injuries.

## PLAINTIFFS' FACTUAL ALLEGATIONS

### A. Illinois Plaintiffs Megan Shipley and Kimberly Aigner

87. Plaintiffs Megan Shipley and Kimberly Aigner are individual consumers who, at all relevant times, were citizens of Chicago and Montgomery, Illinois.

88. Plaintiffs purchased the Products online during the Class Period, from their homes and for shipment to their homes, both located in Chicago and Montgomery, Illinois.

89. Plaintiffs purchased the Products for personal use.

90. Plaintiff Shipley purchased (a) Covergirl Clean Invisible Pressed Powder, Tawny 165; and (b) Covergirl Clean Invisible Pressed Powder, Golden Caramel 180.

91. Plaintiff Aigner purchased (a) Covergirl Clean Invisible Pressed Powder, Tawny 165; (b) Covergirl Clean Invisible Pressed Powder, Golden Caramel 180; (c) Clean Invisible Loose Powder, Translucent Light 110; and (d) Clean Invisible Loose Powder, Translucent Dark 140.

92. At or prior to the time of purchase, Plaintiffs viewed the product packaging online, including the Representations.

93. At the time of purchase, Plaintiffs did not know, and had no reason to know, that the Products contain lead and arsenic.

94. Acting reasonably under the circumstances, Plaintiffs relied on the reputation of the Products and the Representations and believed that the Products would be free from potentially harmful ingredients or contaminants (such as lead and arsenic).

95. Unbeknownst to Plaintiffs at the time of purchase, the Products contain lead and arsenic.

96. Defendant failed to disclose that the Products contain lead and arsenic.

97. Had Plaintiffs known at the time of purchase that the Products contain lead and arsenic, Plaintiffs would not have been willing to pay the same amount for the Products or would not have been willing to purchase the Products.

98. Plaintiffs purchased and paid more for the Products than they would have had they known the truth about the Products. The Products Plaintiffs received were worth less than what they paid.

99. Plaintiffs were injured in fact and lost money as a result of Defendant's improper conduct.

100. Defendant continues to sell the misrepresented Products.

101. Plaintiffs would like to purchase the Products in the future if the Products did not contain lead and arsenic.

102. Plaintiffs continue to suffer harm because they are not able to rely on the labeling and advertising of the Products for their truth and thus are unable to determine whether they can purchase the Products in the future.

103. Unless Defendant is enjoined from misrepresentations on the Products in the future, Plaintiffs and consumers will not be able to reasonably determine whether the lead and arsenic in the Products has been addressed and remedied.

104. Accordingly, Plaintiffs' legal remedies are inadequate to prevent future injuries.

## CLASS ALLEGATIONS

105. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3) on behalf of the following Classes (collectively "the Class"):

> **Nationwide Class:** All citizens of the United States who, within the applicable statute of limitations period, purchased Defendant's Products for personal use and who do not claim any personal injury from using the Products (the "Nationwide Class");
>
> **Multi-State Consumer Protection Class:** All citizens who, within the applicable statute of limitations period, purchased Defendant's Products for personal use and who do not claim any personal injury from using the Products within the following states (the "Multistate Class"):
>
> California, Illinois, Florida, Massachusetts, Michigan, Missouri, New York, and Washington; and
>
> **Illinois Subclass**: All consumers who purchased the Products in the State of Illinois at any time during the relevant statute of limitations for personal use and who do not claim any personal injury from using the Products ("Illinois Subclass").

106. Excluded from the Class and Subclasses are: (i) Defendant, its assigns, successors, and legal representatives; (ii) any entities in which Defendant has a controlling interest; (iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; (iv) all persons presently in bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years; and (v) any judicial officer presiding over this matter and their immediate families and judicial staff.

107. The Class and Subclasses shall be referred to collectively throughout the Complaint as the Class.

108. Plaintiffs reserve the right to amend or otherwise alter the Class definitions at the appropriate time, or to propose or eliminate the Class or Subclasses, in response to, among other factors, Defendant's legal arguments and discovery.

109. This action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23 for the reasons set forth below.

110. Numerosity: Class members are so numerous that joinder of all Members is impracticable. Upon information and belief, each Class consists of hundreds of thousands of purchasers throughout each State. Accordingly, it would be impracticable to join all Members of each or any Class before the Court.

111. Common Questions Predominate: There are numerous and substantial questions of law or fact common to all Class members that predominate over any individual issues. Included within the common questions of law or fact are:

a. Whether Defendant is responsible for the conduct alleged;

b. Whether Defendant's false and misleading statements were likely to deceive Plaintiffs and Class members;

c. Whether Defendant's omission and failure to disclose that the Products contain lead and arsenic is likely to deceive reasonable consumers;

d. Whether Defendant engaged in unlawful, unfair or deceptive business practices by advertising, labeling and selling the Products;

e. Whether Plaintiffs and the Class have sustained damage as a result of Defendant's unlawful conduct; and

f. The proper measure of damages Plaintiffs and the Class sustained.

112. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, individually and on behalf of the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved.

Individual questions, if any, pale in comparison, in both quality and quantity, to the numerous common questions that dominate this action.

113. Typicality: Plaintiffs are Class members. Plaintiffs' claims are typical of the claims of each Class Member in that every member of the Class and Subclasses were susceptible to the same deceptive, misleading conduct and purchased Defendant's Products and suffered the same economic injury. Plaintiffs are entitled to relief under the same causes of action as the other Class members. Plaintiffs' and Class members' claims arise from the same practices and course of conduct and are based on the same legal theories.

114. Adequacy: Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the Class members they seek to represent, they have a strong interest in vindicating their rights and the rights of the Class and Subclasses, they have retained counsel competent and experienced in complex class action litigation, and counsel will vigorously prosecute this action.

115. Predominance: Pursuant to Rule 23(b)(3), the common issues of law and fact identified above predominate over any other questions affecting only individual Class members and Subclasses. The Class and Subclass issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a focus on Defendant's deceptive and misleading marketing and labeling practices.

116. Superiority: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a. The joinder of thousands of individual Class members is impracticable, cumbersome, unduly burdensome, and wasteful of judicial and litigation resources;

b. Class members' individual claims are modest compared with the expense of litigating the claims, thereby making it impracticable, unduly burdensome, and expensive to justify individual actions;

c. When Defendant's liability has been adjudicated, the Court may efficiently determine and administer all Class members' claims in a less burdensome and expensive manner than filing, discovery, and trial of all individual cases;

d. This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f. This class action will assure uniformity of decisions among Class members;

g. The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation; and

h. Class members' interest in efficient resolution by a single class action outweighs their interests in individually controlling the prosecution of separate actions.

117. Accordingly, this Class and the Subclasses are properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class members predominate over any questions affecting only individual Members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### 815 ILCS 505/1, *et seq.*
### (on behalf of Plaintiffs Shipley and Aigner and the Illinois Subclass)

118. Plaintiffs Shipley and Aigner repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

119. This cause of action is brought pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, which states:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

120. The purpose of the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq*. ("ICFA"), is to protect consumers against fraud and unfair and deceptive acts in the conduct of commerce.

121. Defendant's Products constitute "merchandise" within the meaning of 815 ILCS 505/1(b).

122. Defendant is a "person" within the meaning of 815 ILCS 505/1(c).

123. Defendant's activities constitute a "sale" within the meaning of 815 ILCS 505/1(d).

124. Defendant's conduct violates the ICFA because it constitutes an unfair and/or deceptive act and practice based on Defendant's deception, fraud and misrepresentation, and Defendant's concealment, suppression or omission of a material fact.

125. Defendant's conduct, including the deception, fraud, false pretense, misrepresentation, concealment, suppression and/or omission of material facts alleged herein, occurred in connection with Defendant's conduct of trade or commerce in Illinois and constitutes an unfair and deceptive act and practice.

***<u>Deception, Fraud and/or Misrepresentation</u>***

126. Defendant engaged in deception, fraud, false pretense and/or misrepresentation in its manufacture and sale of the Products, including by making the misleading Representations described herein and also by failing to disclose that the Products contain lead and arsenic.

127. Defendant intended that Plaintiffs and Class members rely on the Representations.

128. Defendant's conduct, described above, was and is likely to mislead and Defendant intended to mislead and deceive reasonable consumers.

129. Plaintiffs and the Class were misled and deceived.

130. Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

131. Defendant's misrepresentations and omission are material because purchasers of the Products care about the Product composition and ingredients, including contamination or risk of contamination with lead and arsenic.

132. Defendant had exclusive knowledge of the lead and arsenic levels in the Products and/or was in the best position to assess the lead and arsenic levels in the Products before consumers were exposed to the Products.

133. Defendant made its untrue and/or misleading Representations and omissions willfully, wantonly, and with reckless disregard for the truth.

134. Defendant's Representations and omissions are intended to and did induce Plaintiffs and Class members to buy Defendant's Products.

135. In connection with consumer transactions (*i.e.*, the sale of the Products to consumers), Defendant committed unfair, deceptive, and/or unconscionable acts.

136. Defendant's unfair and deceptive acts or practices were the foreseeable and actual cause of Plaintiffs and Class members suffering actual damage.

137. Plaintiffs and the Class suffered economic injury in fact and lost money as a result of their purchase of the Products due to Defendant's unlawful, unfair, and deceptive conduct.

138. Plaintiffs and the Class were injured through their purchase of the Products, including based on the purchase price of the misrepresented Products.

139. As a result of Defendant's recurring, unfair, deceptive, and unlawful acts and practices, Plaintiffs and Class members have suffered an ascertainable loss in an amount to be established at trial.

140. Plaintiffs seek equitable and injunctive relief to stop Defendant's misconduct, as complained of herein, and seek restitution of the amounts Defendant acquired through the unfair, unlawful, and fraudulent business practices described herein.

***Concealment, Suppression or Omission***

141. Defendant has violated the ICFA by "the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

142. Defendant intentionally fails to disclose that the Products contain lead and arsenic.

143. Defendant's conduct is materially misleading.

144. Plaintiffs and reasonable consumers do not know, and have no reason to believe, that the Products contain lead and arsenic.

145. Defendant's Representations and omission are intentionally designed to mislead reasonable consumers.

146. Plaintiffs and reasonable consumers were in fact misled and deceived.

147. Plaintiffs and Class members purchased the Products and were harmed based on the price paid for a Product that is misrepresented.

148. Plaintiffs would not have purchased, or would not have paid as much for, the Products had Defendant not engaged in the misconduct described herein.

149. Plaintiffs seek equitable and injunctive relief to stop Defendant's misconduct, as complained of herein, and seek restitution of the amounts Defendant acquired based on the misrepresentations and omissions described herein.

## SECOND CAUSE OF ACTION
## VIOLATION OF STATE CONSUMER FRAUD/CONSUMER PROTECTION ACTS
## (on behalf of Plaintiffs and the Multi-State Consumer Protection Class)

150. Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

151. Plaintiffs bring this cause of action on their own behalf and on behalf of the Multi-State Consumer Protection Class.

152. The Consumer Fraud Acts and Consumer Protection Statutes of the States comprising the Multi-State Consumer Protection Class (the "Statutes") are substantially similar and prohibit the use of unfair and/or deceptive acts and practices in the conduct of commerce.

153. Defendant's actions, as complained of herein, constitute unfair, unlawful, deceptive, or fraudulent acts or practices in violation of the Statutes of each of the States comprising the Multi-State Consumer Protection Class, as follows:

- California Unfair Competition Law and False Advertising Law, Cal. Bus. & Prof. Code §§ 17200, 17500 *et seq*. and California Consumer Legal Remedies Act, Cal.; California Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.;

- Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. §§ 501.201–.213;
- Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq*. ("ICFA");
- Mass. Gen. Laws ch. 93A, §§ 1 to 11;
- Michigan Consumer Protection Act (MCPA), Mich. Comp. Laws §§ 445.901 *et seq*.;
- Missouri Merchandising Practices Act (MMPA), Revised Statutes of Missouri (RSMo) § 407.020, 407.025;
- New York General Business Law, §§ 349, 350, N.Y. Gen. Bus. Law §§ 349, 350, 350-a; and
- Washington Consumer Protection Act (CPA), Wash. Rev. Code ch. 19.86.

154. Defendant's uniform, misleading and deceptive Representations and failure to disclose that the Products contain lead and arsenic were, and are, unfair and deceptive acts and practices under each of the statutes in the Multi-State Consumer Protection Class.

155. Defendant intended that consumers rely on the Representations and omissions, as set forth herein.

156. Defendant made the Representations and omissions intentionally, and with reckless disregard for the truth.

157. It was and is likely that consumers would rely on Defendant's Representations.

158. Consumers reasonably relied on Defendant's Representations and were misled and deceived.

159. Consumers did not know and could not be expected to know that the Products contain lead and arsenic, as set forth herein, including because Defendant intentionally or negligently failed to disclose this fact.

160. Plaintiffs and the proposed Class members were proximately injured by Defendant's unlawful conduct, including because they would not have purchased, or would not have paid as much for, the Products had Defendant not engaged in the misconduct described herein.

161. Plaintiffs and the proposed Class members are entitled to damages, restitution, disgorgement, and/or such orders or judgments as may be necessary to restore to any person in interest, any money which may have been acquired by means of such unfair and deceptive acts and practices, and to the relief set forth below.

## THIRD CAUSE OF ACTION
**Negligent Misrepresentation**
**(on behalf of Plaintiffs and the Nationwide Class or the Multi-State Class)**

162. Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

163. Plaintiffs bring this cause of action on behalf of themselves and the Nationwide Class or the Multi-State Class.

164. As described herein, Defendant made the uniform Representations, but failed to disclose the material fact that the Products contain lead and arsenic.

165. Defendant had a duty to accurately and truthfully represent and label the Products.

166. Defendant supplies information to consumers concerning the Products.

167. Defendant is a trusted supplier of clean beauty products.

168. In making the Representations, Defendant knew that the Representations were misleading based on its failure to disclose the lead and arsenic in the Products.

169. Defendant intentionally made the Representations but failed to disclose the lead and arsenic in the Products.

170. Defendant intended to induce and actually induced Plaintiffs and Class members to purchase the Products.

171. Plaintiffs and Class members reasonably and justifiably relied on Defendant's Representations, and the absence of any heavy metal disclosure, in purchasing the Products.

172. Plaintiffs and Class members would not have purchased, or would not have paid as much for, the Products had Defendant not engaged in the misconduct described herein.

173. As a direct and proximate cause of Defendant's misrepresentations and omissions, Plaintiffs and the Class members have suffered damages in an amount to be proved at trial.

## FOURTH CAUSE OF ACTION
## UNJUST ENRICHMENT
**(on behalf of Plaintiffs and the Nationwide Class or the Multi-State Class)**

174. Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

175. Plaintiffs bring this cause of action on behalf of themselves and the Nationwide Class or the Multi-State Class.

176. As set forth herein, Defendant made the Representations and failed to disclose the lead and arsenic in the Products in order to increase sales of the Products and to enrich itself.

177. Defendant was enriched at the detriment of Plaintiffs and Class members, who spent money to purchase the Products that they would not have spent had they known the truth.

178. Plaintiffs and the Class conferred substantial benefits on Defendant through the purchase of the Products.

179. Defendant knowingly and willingly accepted and enjoyed these benefits.

180. Defendant's acceptance and retention of these benefits violates fundamental principles of equity and good conscience.

181. Defendant obtained these benefits based on the misleading labeling of the Products.

182. As a direct and proximate result of Defendant's misconduct described herein, Plaintiffs and members of the Class have suffered damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY
**(on behalf of Plaintiffs and the Nationwide Class or the Multi-State Class)**

183. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

184. Defendant is a merchant and was at all relevant times involved in the manufacturing, distributing, and/or selling of the Products.

185. The Products are considered a "good" under the relevant laws.

186. UCC section 2-314 provides that for goods to be merchantable must (a) pass without objection in the trade under the contract description; (b) in the case of fungible goods, are of fair average quality within the description; (c) are fit for the ordinary purposes for which such goods are used; and (d) run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved.

187. Defendant breached the implied warranty of merchantability because the Products contain lead and arsenic. The lead and arsenic in the Products are present at substantially higher levels than in comparable products. *See* ¶ 42, *supra*.

188. Cosmetics that are marketed as clean are not expected to have lead or arsenic, let alone at the levels found to be present in Defendant's Products.

189. Defendant has been provided sufficient notice of its breaches of implied warranties associated with the Products. On information and belief, Defendant was put on notice through its own product testing and records, and was provided direct notice by letter from Plaintiffs' counsel notifying Defendant of the misconduct alleged herein.

190. Despite giving Defendant notice and opportunity to provide relief to the Plaintiffs and the Class for breach of the implied warranties, Defendant has failed to provide any such relief. As such, Plaintiffs seek compensatory and monetary damages, and request that this Court enter such Orders or judgments as may be necessary to restore to any person in interest any money which may have been acquired by means of the breach of implied warranties.

191. Plaintiffs and each of the Class members were injured because the Products contained lead and arsenic. Defendant thereby breached the following state warranty laws:

a. Code of Ala. § 7-2-314;

b. Alaska Stat. § 45.02.314;

c. A.R.S. § 47-2314;

d. A.C.A. § 4-2-314;

e. Colo. Rev. Stat. § 4-2-314;

f. Conn. Gen. Stat. § 42a-2-314;

g. 6 Del. C. § 2-314;

h. D.C. Code § 28:2-314;

i. Fla. Stat. § 672.314;

j. O.C.G.A. § 11-2-314;

k. H.R.S. § 490:2-314;

l. Idaho Code § 28-2-314;

m. 810 ILCS 5/2-314;

n. Ind. Code § 26-1-2-314;

o. Iowa Code § 554.2314;

p. K.S.A. § 84-2-314;

q. K.R.S. § 355.2-314;

r. 11 M.R.S. § 2-314;

s. Md. Commercial Law Code Ann. § 2-314;

t. Mass. Gen. Laws ch. 106 § 2-314;

u. M.C.L.S. § 440.2314;

v. Minn. Stat. § 336.2-314;

w. Miss. Code Ann. § 75-2-314;

x. R.S. Mo. § 400.2-314;

y. Mont. Code Anno. § 30-2-314;

z. Neb. Rev. Stat. U.C.C. § 2-314;

aa. Nev. Rev. Stat. Ann. § 104.2314;

bb. R.S.A. 382-A:2-314;

cc. N.J. Stat. Ann. § 12A:2-314;

dd. N.M. Stat. Ann. § 55-2-314;

ee. N.Y. U.C.C. Law § 2-314;

ff. N.C. Gen. Stat. § 25-2-314;

gg. N.D. Cent. Code § 41-02-31;

hh. O.R.C. Ann. § 1302.27;

ii. 12A Okl. St. § 2-314;

jj. Or. Rev. Stat. § 72.3140;

kk. 13 Pa. Cons. Stat. § 2314;

ll. R.I. Gen. Laws § 6A-2-314;

mm. S.C. Code Ann. § 36-2-314;

nn. S.D. Codified Laws, § 57A-2-314;

oo. Tenn. Code Ann. § 47-2-314;

pp. Tex. Bus. & Com. Code § 2.314;

qq. Utah Code Ann. § 70A-2-314;

rr. 9A V.S.A. § 2-314;

ss. Va. Code Ann. § 8.2-314;

tt. Wash. Rev. Code § 62A.2-314;

uu. W. Va. Code § 46-2-314;

vv. Wis. Stat. § 402.314; and

ww. Wyo. Stat. § 34.1-2-314.

192. As a direct and proximate result of Defendant's breach of the implied warranty, Plaintiffs and Class members were damaged in the amount of the price they paid for the Products or the price premium paid for the Products, in an amount to be proven at trial.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

a. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as the Class Representatives and appointing the undersigned counsel as Class Counsel;

b. Awarding monetary damages and treble damages as the law permits;

c. Awarding punitive damages as the law permits;

d. Ordering restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiffs and the Class members as a result of Defendant's unlawful, unfair and fraudulent business practices;

e. Ordering injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein;

f. Awarding Plaintiffs and Class members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys and experts, and reimbursement of Plaintiffs' expenses;

g. Ordering Defendant to pay pre- and post-judgment interest on any amounts awarded; and

h. Granting such other and further relief as the Court may deem just and proper.

Date: November 19, 2026

Respectfully submitted,

Plaintiffs Megan Shipley and Kimberly Aigner, individually, and on behalf of all others similarly situated,

By: */s/ Naomi B. Spector*

Naomi B. Spector*
KAMBERLAW, LLC
3451 Via Montebello, Suite 192-212
Carlsbad, CA 95448
Tel: (310) 400-1053
Email: nspector@kamberlaw.com

Benjamin J. Sweet*
Callum T. Appleby*
NYE, STIRLING, HALE, MILLER
& SWEET, LLP
101 Pennsylvania Blvd., Suite 2
Pittsburgh, PA 15228
Tel: (412) 857-5350
Email: ben@nshmlaw.com

*Attorneys for Plaintiffs and the Proposed Classes*

*Generally Admitted